# EXHIBIT A

Page 14

1 back at any documents or emails or do anything like
2 that?
3     A. Not beyond my meeting with my attorneys
4 yesterday afternoon.
5     Q. I don't get to know about what you discussed
6 with your lawyers. That's not the intent of my
7 question. So I'm just wondering if you went out on your
8 own to do anything, and it sounds like the answer is no.
9 Is that fair?
10     A. Yes.
11     Q. Did you happen to talk with anyone besides
12 your counsel about your deposition?
13     A. Yes.
14     Q. Who was that?
15     A. My wife.
16     Q. What was the nature of your conversation?
17         MR. LEONARD: I'd object on privilege.
18         THE WITNESS: What was the nature of our
19 conversation?
20         MR. ANDERSON: Yes.
21         THE WITNESS: Just the schedule and the
22 details of the deposition.
23     Q. (BY MR. ANDERSON)  Got it.  So that's fair.
24 All right.
25         What, sir, is your understanding of why we are

Page 15

1 here today in this particular room at the Grove Hotel?
2 What is your understanding of what we are doing today?
3     A. Recording a deposition.
4     Q. Fair enough.
5         Anything beyond that?
6     A. I think that pretty much explains it.  I mean,
7 I don't understand the question if you looking for more
8 information than that.
9     Q. That's fair.
10         So what is your date of birth?
11     A. October 30, 1972.
12     Q. Have you ever gone by any other names?
13     A. No.
14     Q. Could you give me just kind of a snapshot of
15 your educational background.
16     A. I went to grade school, junior high, high
17 school, and I've got 22 college credits.
18     Q. Where did you go to high school?
19     A. I went to about four different high schools.
20     Q. Where did you graduate?
21     A. I didn't graduate; I got a GED.
22     Q. What year did you get your GED?
23     A. 1991.
24     Q. Thank you.
25         And were all 22 college credits at the same

Page 16

1 university or college?
2     A. Yes.
3     Q. Where was that, sir?
4     A. Phoenix College in Tuscon, Arizona.
5     Q. Is that where you grew up, in Arizona?
6     A. Yes.
7     Q. Are you currently married, sir?
8     A. Yes.
9     Q. What year did you get married?
10     A. 2003.
11     Q. What is your wife's name?
12     A. Sarah.
13     Q. What is her maiden name?
14     A. Sarah Laufenberg.
15     Q. When you got married did she then start to go
16 by Sarah Whipple?
17     A. Not immediately.
18     Q. When did she start to go by Sarah Whipple?
19     A. I don't recall exactly.
20     Q. Can you give me a range, in terms of was it
21 months, weeks, years?  Do you have a recollection?
22     A. It was a few years.
23     Q. We'll get past this question and move on to
24 some more important stuff.
25         Have you ever been charged with a felony?

Page 17

1     A. Yes.
2     Q. What was that charge?
3     A. It was possession with the intent to deliver.
4     Q. Where was that, sir?
5     A. Collinsville, Illinois.
6     Q. What year was that?
7     A. I don't recall exactly.
8     Q. Can you give me just a range?  Are we talking
9 more than 5 years ago, more than 10 years ago?
10     A. More than 25 years ago.
11     Q. What was the outcome of that charge?
12     A. The charges were dismissed.
13     Q. Am I to understand then that you did not plead
14 guilty to any charges associated with that?
15     A. Yes, I did not plead guilty to any charges and
16 the charges were dropped.
17     Q. Have you ever declared bankruptcy?
18     A. Yes.
19     Q. What year was that, do you recall?
20     A. 2012.
21     Q. Have you declared bankruptcy just that one
22 time?
23     A. Correct.  Yes.
24     Q. Where did you file that, do you recall?
25     A. In Idaho.

Page 62

1   A. Yes.
2   Q. And if you turn to the last page, is that your
3   signature?
4   A. Yes.
5   Q. I'll represent to you, sir, that Exhibit 5 was
6   a document that was produced by you.  If you ever see
7   anything in the bottom right-hand corner that says
8   "DEF," that is the shorthand for Defendant, that means
9   you produced it, okay, just for clarity.
10   But to your knowledge, was Exhibit 5 ever
11   signed by Randall Heeb and Ann Merchant?
12   A. Not as is.
13   Q. Because I'll show you -- just to be fair, I'll
14   show you a construction agreement that was signed by
15   everyone.
16   A. Okay.
17   Q. My understanding is it's kind of the agreement
18   for the 555 job.  But I'm just trying to figure out, I'm
19   just trying to make sense of what Exhibit 5 is.
20   A. It was the original construction agreement for
21   the job.
22   Q. It's dated back in September of 2015?
23   A. Correct.
24   Q. That is roughly about the time things got
25   kicked off; is that fair?

Page 63

1   A. That's about the time I started doing some
2   work on the site; correct.
3   Q. Okay.  On the first page up here where it says
4   "Contractor" it has a line that says "Whipple, Inc.,"
5   and then another line that says "Jason Whipple, et al."
6   Do you see that?  E-t-a-l?
7   A. Yes.
8   Q. What does "et al." mean, if you know?
9   A. The registered contractor for Whipple,
10   Incorporated.  I mean, what do those specific initials
11   mean?  I can't tell you.  I don't know.
12   Q. So who prepared this document, Exhibit 5?
13   A. Whipple, Inc.
14   Q. So the entries here under Contractor are
15   something that somebody at Whipple, Incorporated put
16   down?
17   A. Yes.
18   Q. I'm going to stop guessing.  Is that somebody
19   you?
20   A. Yeah.
21   Q. So when we see here, "Jason Whipple et al.,"
22   those are words you wrote?
23   A. Not me specifically, but yeah, I was involved
24   in that.
25   Q. Who specifically --

Page 64

1   A. I'm sure Sarah probably typed the document.
2   Q. But it was based on your instruction to put
3   those words as we see them here, "Jason Whipple, et
4   al."?
5   A. Correct.
6   Q. I'm going to show you what I understand to be
7   the construction agreement for this job.
8   (Exhibit 6 marked.)
9   Q. (BY MR. ANDERSON)  You've been handed
10   Exhibit 6.  You can certainly take some time to look it
11   over.  For purposes of today I'm not going to go through
12   everything line by line.
13   A. (Reviewing document.)  Okay.
14   Q. I just said we are probably not going to look
15   at Exhibit 5, and I'm going to immediately backtrack.
16   I'm sorry.
17   A. Okay.
18   Q. If you look at Exhibit 5 compared to
19   Exhibit 6, the content seems to be relatively similar to
20   me as I read it, but the formatting looks a little
21   different in terms of numbered paragraphs and things
22   like that.  You can look at them and see what I'm
23   talking about.  Who changed the formatting as far as
24   numbers?
25   A. Tim Tyree.

Page 65

1   Q. Tim did?  Tim was the one that did that?
2   A. Yes.
3   Q. That's what I thought.
4   So looking at Exhibit 6, do you recognize
5   Exhibit 6?
6   A. I do.
7   Q. And Exhibit 6 appears to be the construction
8   agreement for the 555 Whitewater job; is that fair?
9   A. Yes.
10   Q. And if you turn to the second-to-last page of
11   Exhibit 6, it's page 298.  Is the signature on that page
12   your signature?
13   A. Yes.
14   Q. To be more specific, there are three
15   signatures.  Is the signature under the title Contractor
16   your signature?
17   A. Yes.
18   Q. Thank you.
19   So if you go back to page 1, it appears to
20   take the same kind of definition of contractor.  It has
21   Whipple, Inc., Jason Whipple, et al.
22   I'm curious, sir, about, I want to get your
23   best understanding of how this agreement works, and I'm
24   not going to ask you about every page and quiz you
25   there.  But I want to start with what I'll call section

---

Page 66

1 2 that's on page 1 that deals with the title Cost Plus
2 Services & Administration.
3      So it says:  Construction will be billed at
4 contractor's cost plus a contractor's fee of 10 percent.
5 Okay?  So just explain to me in your world what that
6 means for you.
7      A.  That means that a 10 percent contractor's fee
8 will be applied to the bill to cover the things listed
9 in No. 2.
10     Q.  So let me just see if I can understand.  We
11 can read section 2 and it has the percentage markup, so
12 to speak, that you can apply, whether it's 5 percent or
13 10 percent, depending on where you are in the job.
14     But let me give you an example.  Let's say I'm
15 Faron Gilbert and I come to you and give you my bill.
16 When you turn that bill into an invoice to send to
17 somebody like my clients, is that something that you can
18 markup by 10 percent?
19     A.  No.
20     Q.  You can't --
21     A.  Well, wait.  Can you apply a 10 percent
22 contractor's fee to it?
23     Q.  Yes, sir.
24     A.  Yes.  I'm sorry.  I misunderstood the
25 question.

---

Page 67

1      Q.  I asked you a horrible question which is why.
2      Can you apply your contractor's fee to Faron's
3 bill?
4      A.  Yes.
5      Q.  That would apply with respect to essentially
6 any subcontractor; is that fair?
7      A.  Yes.
8      Q.  You hire a sub, not somebody that you employ;
9 right?
10     A.  Um-hmm.
11     Q.  So you go hire a sub, whether it's Faron or
12 whether it's Robertson Supply --
13     A.  Robertson Supply is a supplier; so that's
14 different.
15     Q.  Let's break that down.  So let's start with
16 subcontractors like Gilbert Mountain Trucking.
17     A.  Yes.
18     Q.  That's something you can apply your contractor
19 fee to.
20     A.  Yes.
21     Q.  Robertsons Supply, a supplier; right?  Is
22 their invoice or billing to you something you can apply
23 a contractor fee to?
24     A.  Yes.
25     Q.  ProBuilt?

---

Page 68

1      A.  Yes.
2      Q.  So I'm starting to understand.
3      Now let's look at page 2 of the document, of
4 Exhibit 6, which is 294.  There is a section 3 that is
5 Construction Services.  Do you see where I am?
6      A.  Yes.
7      Q.  So paragraph sub (a):  "Contractor agrees to
8 provide construction services as required or necessary
9 for the completion of the described project.
10 Construction services and rates are as follows:"  And it
11 has a breakdown of bullet points of anything from
12 general labor all the way up to equipment and handling;
13 right?  Do you see where I am?
14     A.  Yes.
15     Q.  So when you are talking about general labor,
16 who does this apply to, who are we talking about?
17     A.  A low skilled worker or lower skilled worker
18 providing random labor services.
19     Q.  Are these people that you employ?
20     A.  Sometimes.
21     Q.  Sometimes.  So help me understand.  What goes
22 into "sometimes"?
23     A.  So I either will hire an employee or I'll hire
24 somebody to work for me by the hour through contract
25 labor.

---

Page 69

1      Q.  So how do you distinguish between the two?
2      A.  If the individual has their own entity or
3 works for an entity that has proper insurance and
4 worker's comp, then they can be -- that I consider
5 contract labor, versus if I hire somebody who is just an
6 individual, then I actually put them on payroll and run
7 them through payroll as an employee of Whipple.  Very
8 common in the industry today.
9      Q.  I'm just trying to understand.  You have
10 people on your payroll that are traditional employees
11 that might fit within the general labor, et cetera, that
12 we are talking about.  Is that fair enough?  I just want
13 to make sure I'm following you so far.
14     A.  Yes.
15     Q.  And then there are other people that might
16 have their own entities that have their own insurance
17 that you would also hire.
18     A.  Yes.
19     Q.  That's fair too.
20     A.  Yes.
21     Q.  So those in the latter category, people with
22 their own insurance and own entities, those essentially
23 technically would be subcontractors because you don't
24 employ them.
25     A.  I don't consider them the same, but I guess it

---

Page 70

1  depends on who you ask, I guess, or how you look at it.
2      Q.  Yeah, I'm curious about how you look at it
3  because --
4      A.  I don't look at them as subcontractors.  I
5  look at them as hourly workers.  Same difference, I
6  guess.  If they have their own entity, they are subject
7  to the same logistical requirements as a subcontractor.
8  In other words -- well, I guess I think that explains
9  it.
10     Q.  For example, you don't withhold taxes from
11 whatever they charge you when you are talking about
12 these subcontractors with separate entities that are
13 doing labor.
14     A.  Correct.  No.
15     Q.  It's the same process as like Faron, they bill
16 you and then you pay them; right?
17     A.  Similar, but no, not the same.
18     Q.  Why is it different?
19     A.  Because I typically don't -- I don't bill by
20 the hour necessarily for somebody like Faron.  Sometimes
21 he bids the work or it's by the piece or it's he taking
22 on a portion of the project on his own.
23     Q.  Okay.  But I've looked at all of the records
24 for, and we are focusing on Faron just as an example,
25 Gilbert Mountain Trucking, it looks like he would do

Page 71

1  work for you, you would invoice -- I'll show you an
2  exhibit here in a second -- and he would keep track of
3  hours of excavation, or whatever the case may be, and
4  that's kind of bundled up and given to Alderwood
5  Builders as a bill from Faron; right?
6      A.  Correct.
7      Q.  And then you take that bill and essentially
8  charge to the job exactly what Faron charged you and
9  then add your contractor's fee.
10     A.  Correct.
11     Q.  Faron would be a subcontractor, as we've just
12 established his role, with respect to this 555
13 Whitewater project; right?
14     A.  Yes.
15     Q.  So now we have yet a different, as I'm
16 understanding it, in your mind, situation of laborers.
17 I just want to see how you view --
18     A.  Hourly workers would be my description.
19     Q.  Thank you.  I'll use your term.  Hourly
20 workers.  And sometimes those hourly workers are your
21 employees in a traditional sense where they are on your
22 payroll?
23     A.  Correct.
24     Q.  And sometimes those hourly workers are --
25     A.  Contract labor.

Page 72

1      Q.  -- contract labor with their own businesses
2  and own separate entities.
3      A.  Correct.
4      Q.  In your mind do you not consider those latter
5  people to be subcontractors?
6      A.  I don't treat them the same.
7      Q.  So let me start with why don't you treat them
8  the same?
9      A.  Because they are working by the hour on
10 multiple phases of the project catering to the needs of
11 the project as a whole, not the specific needs of a
12 portion of the project.  In general construction there
13 is a lot off in between, a lot of labor people.
14     Q.  Sure.  I understand that, which is why I'm
15 trying to get why you differentiate that in your mind.
16 Essentially it sounds to me like you have kind of a
17 stable, I'll call it, of labor for hire.
18     A.  Fair enough.
19     Q.  Is that a fair enough assessment?
20     A.  Yes.
21     Q.  I've looked at texts from people about, What
22 job am I going to today?  Where are we working today?
23     A.  Correct.
24     Q.  And they just check in with you.  It's like,
25 You go over here, and you go over here.

Page 73

1      A.  Yeah.  And typically people that fall into
2  this category would work on multiple jobs.
3      Q.  To be fair with you, I'll show you some
4  documents because I'm going to have questions about the
5  555 job and there was like a 161 job --
6      A.  Yeah.
7      Q.  But I'm just trying to get a sense of how you
8  keep track of things and how you view folks and
9  differentiate.
10         So let me ask you this:  If you have somebody
11 who has their own separate business who comes to you
12 and, let's say, they are charging you, call it a
13 journeyman with tools, $41 an hour, and they are not on
14 your payroll, how are you supposed to account for that
15 particular invoice from that particular laborer when you
16 ultimately charge the client for the job?
17     A.  Can you clarify the question further.
18     Q.  Yeah, let's say you go hire -- are you
19 familiar with Lucid Construction?
20     A.  Yes.
21     Q.  Let's say you hire Lucid.  Lucid comes to
22 you and -- just take Whitewater.  No, let's not take
23 Whitewater.  I'm talking about this particular
24 agreement, your understanding of Exhibit 6 and how it
25 works.

Page 74

1      Let's say Lucid comes to you and they'll say,
2  Okay, we are going to charge you $41 an hour for our
3  journeyman with tools, and they invoice you for the
4  month, a given month, for the guys on their crew and the
5  hours that they worked.  What is your understanding
6  under this agreement, how do you then take what Lucid
7  invoices you, how do you treat that and then turn it
8  into an invoice to my clients?
9      A.  For hourly direction, I would use the rates
10  under line item 3.
11      Q.  So in other words, your understanding is you
12  would be able to, with my hypothetical, charge 45?
13      A.  Yes, because that is the journeyman rate.
14  That's exactly right.
15      Q.  Then do you get to also include a builder's
16  fee on top of that 45?
17      A.  Yes.
18      Q.  What provision of this contract allows for
19  that?
20      A.  The hourly rates and the descriptions listed
21  on there, like general labor, apprentice with tools,
22  journeyman with tools, equipment and handling.
23      Q.  So how in that situation does that differ from
24  somebody like Faron and Gilbert Mountain Trucking?
25      A.  The difference would be Faron is a

Page 75

1  subcontractor that is going to handle dirt work and
2  excavation and supply material to the job, and that
3  specifically to a specific portion of the job.
4      These guys are going to provide random labor
5  under my direction on a daily basis for all phases of
6  the job, and this includes me.
7      Q.  Sure.  But we are just talking about the folks
8  that are not on your payroll.  We are talking about, in
9  my example, somebody like Lucid.
10      A.  Lucid, right.
11      Q.  But I just want to make sure I understand.
12  Your belief is that the contract allows you to mark up
13  what Lucid would charge you and then apply your
14  builder's fee to it, regardless of what you were
15  actually charged by Lucid.
16      A.  My contract allows me to charge $45 an hour
17  for a journeyman that's basically under my direction.
18  And yes, that's exactly what I would do.  I would charge
19  that rate for that journeyman if he was contract labor
20  under my direction.
21      Q.  Okay.  Are you, as you sit here today, aware
22  of whether, in fact, you took an invoice from a laborer
23  and charged a higher rate under your contract and then
24  billed it to my clients?
25      A.  Clarify the question.

Page 76

1      Q.  Sure.  I'll show you a document in a minute
2  where Lucid Construction invoices you for $41 an hour,
3  and then you turn that into an invoice to my clients for
4  $45 an hour and charge your builder's fee on top of
5  that.
6      A.  Yeah, I charge an hourly rate.
7      Q.  So you wouldn't be surprised in a minute if I
8  show you an exhibit to that effect.
9      A.  No.  That's exactly how I do it.
10      Q.  That's, in fact, how you do it.
11      A.  Yeah, with that specific person especially,
12  because he provides contract labor for me then and now.
13      Q.  At any point in time did you ever tell my
14  clients that's what you were doing?
15      A.  I don't recall.
16      Q.  You don't recall?  Okay.
17      A.  Huh-uh.  I mean, it's in the contract, stated
18  in the contract.
19      Q.  To be fair, sir, it's your interpretation of
20  what the contract permits you to do.
21      A.  Okay.
22      Q.  We'll be done with this in a second.  So let's
23  keep going on.
24      Page 295, I'm curious about -- let's go to 296
25  because I don't want to burn up some time here.

Page 77

1      So let's look at section 12 there at the
2  bottom.  It says Commencement & Completion of
3  Construction.  Do you see where I am?
4      A.  I do.
5      Q.  I'm curious about, so subparagraph (a), the
6  first sentence, it states that:  "Contractor will
7  diligently and expeditiously proceed with the project
8  using adequate resources to achieve substantial
9  completion of the project for occupancy within 24 months
10  from the commencement of construction."  I just read it
11  to you, but you can read.
12      What is your best understanding of when
13  construction commenced?
14      A.  Sometime in the fall of 2015.
15      Q.  So if you turn --
16      A.  Or summer maybe, summer or fall, late summer,
17  early fall of 2015.
18      Q.  That's fair enough in terms of we are going on
19  a 5-year memory contest.  So I get that.
20      If you turn the page to 297, if you look at
21  subparagraph (b) of section 12 at the top of the page,
22  it starts with:  "Upon substantial completion of the
23  home" -- then it has a number of things that the
24  contractor should do, including providing as built
25  plans.  Did that ever happen for the 555 Whitewater job?

Page 90

1    A. To schedule?
2    Q. Yes.
3    A. No.
4    Q. Same question in terms of scheduling, but in
5 terms of who does the hiring for Alderwood Builders?
6    A. Can you be more specific?
7    Q. Sure. My specific question is who is the one
8 that calls up the trades and does the actual, come
9 out --
10    A. I do.
11    Q. So you call guys like Faron and get them out
12 there?
13    A. Yep. Yep.
14    Q. I've seen lien waivers in your file, and so
15 who is the one that is responsible for securing the lien
16 waivers for Alderwood Builders?
17    A. The title company. Well, maybe I am answering
18 the question wrong. Be more specific.
19    Q. Thank you. Let me clarify it.
20    I understand that the title company probably
21 wants a lien waiver as a condition of releasing a draw
22 payment, but I'm having a more technical process
23 question. Who is the one that says, Mr. and Mrs.
24 Contractor, sign this and you can get paid?
25    A. Specifically nobody. But maybe it's because

Page 91

1 the question was just asked in a way that doesn't apply
2 to how we do business.
3    Q. Help me out. Tell me how that works.
4    A. So when a check goes out, a lien waiver is
5 included, and we usually list the check number. And
6 then we request that that subcontractor, upon cashing
7 that check, signs the lien waiver and acknowledges that
8 cashing that check is part of that lien waiver process.
9    Q. Thank you.
10    So it sounds like the lien waiver and check go
11 out together, there is an ask that it gets signed.
12 What's the checks or balances that exist for if someone
13 cashes a check and doesn't sign a lien waiver?
14    A. The title company usually follows up with me
15 on that. And so in that situation, if that situation
16 occurs, the title company will request a copy of the
17 paid check.
18    Q. Who at Alderwood Builders is responsible for
19 preparing budgets?
20    A. Both Sarah and I work together on budget
21 estimating.
22    Q. Would you say, is that kind of a 50/50 shared
23 task or does someone have more of a lead than the other?
24    A. It's probably a shared task.
25    Q. What about kind of administrative paperwork

Page 92

1 types of things, whether it's keeping track of checks
2 that go out and bookkeeping?
3    A. That would mainly be Sarah.
4    Q. Okay. Does Alderwood Builders, Whipple, Inc.,
5 have any employees today?
6    A. Not today, no.
7    Q. Did it have employees in the 2015 to 2018 time
8 period?
9    A. I think so.
10    Q. Are we talking five or less?
11    A. I don't recall specific. I would have to
12 refer to my records to answer correctly.
13    Q. So let me ask you this: At the time of
14 construction of the 555 job, how many other jobs did
15 Alderwood Builders have going on?
16    A. I don't recall exactly, at least two. But I
17 can't -- I do lots of different stuff. So that would
18 be -- again, I would have to refer to my records because
19 there was a long period of time.
20    Q. I'll show you this in a second, but I just
21 want to jog my memory. I thought I saw a reference to a
22 161 job?
23    A. Yeah.
24    Q. Does that ring a bell?
25    A. Yeah, that was one of them.

Page 93

1    Q. I know we said we would break in 10 minutes.
2 Let's just jog through these, then we'll take a break.
3    A. Sure.
4    Q. Who is HighMark Builders?
5    A. That's one of my -- that's my framing crew,
6 one of my framing crews.
7    Q. And is Taylor Jones, is that essentially the
8 owner?
9    A. Yeah, I think so. I think he's the owner.
10    Q. HighMark Builders is an incorporation, right,
11 to your understanding, or do you know?
12    A. That I do not know.
13    Q. But HighMark Builders is not an employee of
14 Alderwood Builders; right?
15    A. No; contract labor.
16    Q. So you don't issue a W-2 to HighMark Builders,
17 withhold taxes, and do traditional payroll type stuff;
18 right?
19    A. No.
20    Q. Same questions with respect to Lucid Creative
21 Services; what is your understanding of that entity?
22    A. Same thing, contract labor.
23    Q. Same answers in terms of not your employees,
24 et cetera?
25    A. No, he is not my employee.

Page 110

1 "...I am totally fine with agreeing today is the date of
2 substantial completion."
3     A. Yeah, he says that. And I think he was
4 referring to work completed on the project or something.
5 We didn't do substantial completion. Like, we didn't go
6 through the process of substantial completion. So it
7 was not done on the 15th. I think that what he's
8 saying, and this is my interpretation of it, but I think
9 what he's saying is that as of this date that
10 substantial completion can be scheduled. I think that's
11 what he means, that's what I interpret.
12     Q. That was the nature of my question. I want to
13 know your interpretation of the email as you received
14 it.
15     A. Um-hmm. I think he's saying, Yeah, we can
16 agree to go ahead and schedule for substantial
17 completion.
18         MR. ANDERSON: I'll hand you the next one.
19         (Exhibit 13 marked.)
20         THE WITNESS: That one's going to be tough.
21     Q. (BY MR. ANDERSON) I'm sorry. Well, and this
22 is the way it printed out. I will represent to you that
23 this is part of a couple of exhibits that were filed on
24 your behalf on your Motion For Partial Summary Judgment.
25     A. Okay.

Page 111

1     Q. Recognizing the print is very small, if you
2 want me to, I can just walk you through what I'm
3 interested in so you don't have to strain over it.
4     A. I have my magnifier so...
5     Q. Just looking at the first page of Exhibit 13,
6 it appears to be an email from you to Randal Heeb, Ann
7 Merchant, and Tim Tyree. Is that fair? Do you see
8 where I am?
9     A. Yes.
10     Q. Then if you turn to the second page, which has
11 the PLTF4333.
12     A. Yeah.
13     Q. If we count full paragraphs, one, two, three,
14 four paragraphs.
15     A. 4334?
16     Q. 4333.
17     A. Okay. Go ahead.
18     Q. So if you look at 4333, just count four full
19 paragraphs down, and it starts with "The project..."
20     A. Yes.
21     Q. These appear to be words that you wrote in
22 response to an email: "The project reached substantial
23 completion November 15th." Are those words you wrote?
24     A. Yes. I was referring to on-site construction.
25     Q. Then let's just go to the last page, 4323.

Page 112

1     A. The first page you mean?
2     Q. The very last page. It says Exhibit B at the
3 top.
4     A. I see.
5     Q. This appears to be another email that you
6 wrote to Randal Heeb and Ann Merchant on December 3rd,
7 2018. I know it's hard to read because of the font
8 size.
9         But in the first full paragraph if you go four
10 lines up from the bottom, it starts with: "Technically,
11 I did not achieve substantial completion until Friday
12 November 16th at 6 p.m."
13     A. Again, I was referring to the project, the
14 work being performed on-site. We had guys in there
15 until late Friday night. Actually, I had a crew in
16 there working just on little things.
17     Q. So based on this email, did you reach
18 substantial completion by Friday, November 16th?
19     A. We completed the on-site work and were ready
20 to start with the punch list but we didn't achieve, we
21 didn't go through the substantial completion process as
22 described in the contract. The substantial completion
23 is a separate process from the on-site construction
24 being substantially complete, if that make sense. Not
25 to confuse the two. Even though it's the same term and

Page 113

1 literally means what it is.
2     Q. Okay. So when we talked about punch list and
3 your understanding of the term punch list, what's your
4 first knowledge of the existence of a punch list for the
5 555 job? When are we talking about that --
6     A. I created one for myself that week.
7     Q. Which week?
8     A. The week of November 16th.
9     Q. To your knowledge, was one created prior to
10 November 16th of 2018?
11     A. I create punch lists throughout the project
12 for myself and for my workers and for subcontractors.
13 Everybody gets a punch list at the end. Hey, there's
14 three things you missed over here. So punch list is an
15 ongoing term.
16     Q. But in the end is a punch list something that
17 comes up as the project nears the end of construction?
18     A. No, punch lists are made throughout the
19 project.
20     Q. Throughout the project.
21     A. Yeah, for multiple different reasons. That's
22 a broad term. But the punch list described -- that's
23 just a broad term. If you want to be more specific
24 about the question, I can answer it more specifically
25 about specific punch lists or punch lists relative to

Page 114

1  substantial completion.
2      Because basically the punch list that was
3  relative to substantial completion that Stephen gave me
4  as a first draft is listed in this Exhibit 12.
5      Q.  Got it.  Okay.  Because I'm going to show you
6  something because I want to see if we can clear up my
7  confusion.
8      (Exhibit 14 marked.)
9      Q.  (BY MR. ANDERSON) So I'm going to ask you a
10 little bit about Exhibit 14, but again, take the time
11 you need to get comfortable with it.
12     A.  (Reviewing document.)  Okay.
13     Q.  Do you recognize Exhibit 14?
14     A.  Yes.
15     Q.  What does it appear to be?
16     A.  It appears to be an hour sheet for the month
17 of August from William Cunningham.
18     Q.  That's the Bill Cunningham, McCall
19 Construction Services we've been talking about?
20     A.  Correct.
21     Q.  Just if we can break this down.  He has in the
22 upper right-hand column a column for Heeb and then a
23 column for Scott.  Those are two different jobs?
24     A.  Correct.
25     Q.  So he kind of has hours for one in one column

Page 115

1  and hours for the other in the other.
2      A.  Yep.
3      Q.  It looks straightforward.
4      If you look at the middle of the page starting
5  the entries on August 13th, he's got a 6-hour entry for
6  Heeb punch list.
7      A.  Yep.
8      Q.  Then on August 14th, two lines down, he has
9  another entry for 11 hours of Heeb punch list.
10     A.  Yes.
11     Q.  Then all the way down on the 28th he's got a
12 12 1/2-hour entry for punch list, and then he assigns
13 that with an arrow to the Heeb column.
14     A.  Um-hmm.  I see that.
15     Q.  So this is all in the same period of time
16 right before the Labor Day party that you've been
17 talking about; right?
18     A.  It was.  Yeah, yeah.  Now that you mention it,
19 yeah.
20     Q.  Do you know how many people wound up attending
21 that party?
22     A.  I do not.
23     Q.  Do you know as you sit here today looking at
24 Exhibit 14 what punch list that Bill is working on?
25     A.  Not specifically.  No, not specifically.  Like

Page 116

1  I said, punch list is a general term that we use
2  throughout the project.  I could make a punch list
3  daily.
4      Q.  Would it exist somewhere, if you were to go
5  look for it and be able to find this particular punch
6  list?
7      A.  Not likely, no.  We'll make little lists of
8  things for the day or the week, and we don't
9  necessarily -- it's not a formal document.  It's just a
10 list of things that need to be done.  And that's what a
11 punch list is, a punch list is often referred to as a
12 list we made of things that need to be accomplished.
13     Q.  In just tallying up the hours, he spent about
14 29 1/2 hours working on what appears to be punch list
15 entries.
16     A.  Yeah.  Yeah.  Punch list does not define
17 billable or nonbillable hours.
18     Q.  Do you recall paying him for all the hours he
19 submitted?
20     A.  Yes, I'm sure I did.
21     Q.  We're going to switch gears and talk about
22 Colton.  How do you pronounce his last name?
23     A.  Scholtec, to the best of my knowledge.
24     Q.  What was Colton's scope of work for 555?
25     A.  To provide lighting control, audio/video

Page 117

1  network and security, and including shades.
2      Q.  All of the fancy automation stuff.
3      A.  Yeah, integration and automation, but more
4  than that.
5      Q.  How long have you known Colton?
6      A.  Probably since 2014.
7      Q.  How did you come to know him?
8      A.  He worked on one of the same projects I was
9  working on.
10     Q.  Is Colton kind of the go-to automation AV guy
11 in Valley County?
12     A.  He is one of them.  Well, kind of one of the
13 only ones now, yeah.
14     (Exhibit 15 marked.)
15     Q.  (BY MR. ANDERSON) I'm not going to ask you
16 about every single thing on here.  I gave you, I'll just
17 represent to you this was a set of text messages that
18 were provided to me that I was able to retrieve
19 yesterday.  My understanding, based on the way that this
20 was produced, is this is a set of your text messages
21 that you retrieved with respect to this case to and from
22 Colton.
23     A.  Yeah.
24     Q.  It starts at 5596, and I double-sided it, so
25 it winds up the exhibit stops at 5656.  Just have a

Page 122

1   4:53:  "...how's it looking?"  What's he asking for?
2   He's asking you...
3       A.  It looks like he has submitted an invoice to
4   me or some paperwork, and I am corresponding with him on
5   that paperwork.
6       Q.  Well, then you respond:  "...overwhelming!
7   Haven't gotten there yet."  Do you have a memory as you
8   sit here today about what was overwhelming or what was
9   going on?
10      A.  I don't know, no.  I was trying to remember
11  what was going on.  Sounds like I was spread thin.
12      Q.  Yeah, because you kind of almost say that much
13  when you say:  "I have to take a break," you're getting
14  burned out.
15      A.  Yeah.  Sometimes I just get pulled in so many
16  directions I need a break, and I have everybody wanting
17  something from me at once.
18      Q.  On the 10th at 9:38 there's a blacked-out
19  text.  I'm confused because I'm trying to ask you
20  questions about this particular string and your memory
21  is kind of, like I said, it is what it is.
22      A.  It's been a long time.
23      Q.  But he responds to whatever is blacked out
24  there:  "Almost got it figured out."  Do you know what
25  he was trying to figure out?

Page 123

1       A.  I don't.  Nor do I know why it was redacted.
2       Q.  So then you say:  "Sweet."  But as you sit
3   here today, you have no concept of what Colton was
4   trying to figure out?
5       A.  I don't.  Him and I have worked on quite a few
6   jobs together.
7       Q.  But this was produced to me in reference to
8   this case.  So does your memory allow you to conclude
9   that you're talking about the Heeb job?
10      A.  I almost don't think I am based on what it's
11  saying.  It sounds like I'm talking about a different
12  job, but I don't know.  I can't tell you specifically.
13  And what might help me is looking at the redacted text
14  too.  Maybe I can go back and see that and then it will
15  jog my memory, or maybe if I read through this more
16  thoroughly leading up to it I would understand.  But
17  sitting right here now I can't answer that.
18      Q.  I'll tell you what, I'm going to show you a
19  document here in a second that connects this
20  conversation to the Heeb job, at least in terms of down
21  to the penny.
22      A.  Okay.
23      Q.  So my understanding is you're talking about
24  the Heeb job.
25      A.  Because of the 27k?

Page 124

1       Q.  That, and if you look on page 5618 at the top:
2   "I am just doing the math, 61,802.99," that shows up in
3   one of Colton's invoices for Heeb.
4       A.  It was after discount.
5       Q.  Let's just see if we can nose our way through
6   this because maybe Colton is the better person to talk
7   to.
8          So go back to page 5617, and after you say
9   "Sweet," this is a text from you to Colton, where you
10  say:  I realized, and I think it's the invoice is going
11  to put me over my contractor's fee discount so I'm back
12  at my full 10 percent on the majority of your invoice.
13  What are you communicating here?
14      A.  You know, I can't remember specifically.
15  Surely I'm talking about a sales commission would be my
16  guess.
17      Q.  A sales commission to who?
18      A.  Well, Virtual Design Concepts takes a sales
19  commission from Colton Scholtec for anything that gets
20  spec'd into the home.
21      Q.  So help me understand that.  Virtual Design
22  Concepts gets a commission from Colton?
23      A.  Um-hmm.  Yeah, you should have all the
24  invoices and checks paid and everything in your docs.
25      Q.  From Virtual Design Concepts?

Page 125

1       A.  Yeah.  I gave them to you or we really should
2   have given them to you after that last round of
3   subpoena.
4       Q.  I have not seen those so I guess we'll have to
5   get to the bottom of that.
6          So help me connect the dots in terms of
7   Virtual Design Concepts and how it works with Colton.
8   If Virtual Design Concepts gets a job, help me
9   understand how the sales commission works.
10      A.  It's evolved over time.
11      Q.  But as it relates to what you were just
12  testifying to with respect to the texts in 2017, what
13  was going on then?
14      A.  Can you be more specific?
15      Q.  I really can't because I'm not following what
16  you're telling me in terms of the sales commission.  Did
17  Virtual Design Concepts get a sales commission from
18  Colton on the 555 job?
19      A.  Yes.
20      Q.  Do you know how much that was for?
21      A.  I don't know an exact amount.
22      Q.  Can you give me an estimate?
23      A.  Dollar amount?
24      Q.  Yes.
25      A.  I can't.  I don't know.  I would have to look

Page 126

1  at my records.
2      Q. Well, I'm at a disadvantage because I don't
3  have those records. So can you give me a range in terms
4  on what you would expect the dollar amount to be?
5      A. 10 to $15,000.
6      Q. So walk me through. Colton does his invoicing
7  or his bids, and gets a job; right? Let's talk
8  specifically about 555 Whitewater.
9      A. Okay.
10     Q. And he's going to get the work. So if he gets
11 the work, are you telling me that he owes a commission
12 to Virtual Design?
13     A. Yes. If Virtual Design initiated the sale.
14     Q. Your best memory is that Colton got a
15 commission -- or Colton gave a commission to Virtual
16 Design for the 555 Whitewater?
17     A. Colton and Virtual Design shared an office
18 space and created a show- -- Colton created a showroom
19 for his products within that office space, and Virtual
20 Design used that office space for professional meetings
21 and the conference room and whatnot. And that
22 conference room in that office is where we, Virtual
23 Design Concepts and Audio Video Plus, made the sale to
24 Randy and Ann for the lighting, the shades, and the
25 audio/video system.

Page 127

1      Q. Got it.
2      A. Which was about $250,000 worth of product.
3      Q. So Audio Video Plus, we've established, is
4  Colton's business, and Audio Video Plus was a
5  subcontractor for the 555 job. Is that fair?
6      A. Yes.
7      Q. So Colton knows that if he gets work through
8  Virtual Design, and the work is landed and he's brought
9  on board to do it, that he owes a commission to Virtual
10 Design?
11     A. Yep. Our agreement is that as he receives
12 funds on the project, he pays that commission. And
13 those terms have changed and evolved and varied from
14 different projects over the years.
15     Q. Okay. So let's go back to 5617, and you're
16 talking about, you just say you realize that the invoice
17 put you over your contractor's fee discount amount.
18 What are you referring to there?
19     A. I'm not sure, but I think we're referring to
20 fixtures that were provided on top of the agreement, but
21 I would have to double-check. In other words, he sold
22 them $250,000 for the product, not including fixtures.
23     So if you look at my contract, I have a markup
24 for supplied items as Whipple, Incorporated, and for
25 those discounted items, as it states in the contract,

Page 128

1  I'm allowed to charge a 10 percent markup. So not
2  knowing specifically or being able to refer to what
3  we're talking about specifically, my guess is that we're
4  talking about a list of fixtures or something along
5  those lines. And the reason is the 10 percent
6  because -- well, I think that's why.
7      Q. You said you could go look and figure it out.
8  Where would you go to look to figure it out and what
9  would you do?
10     A. Well, I would probably just comb through this
11 section of texts more, and then I would refer to any
12 check amounts, as you did, and chase it down in the same
13 manner.
14     Q. But is this 10 percent, is that the 10 percent
15 of your contractor's fee we were talking about earlier
16 today or is that some other markup?
17     A. It probably is because I believe my
18 contract -- can I refer to my contract?
19     Q. Of course, yes.
20     A. (Reviewing document.) So No. 4 says:
21 Contractor agrees to extend all Contractor discounts on
22 all discounted items and wholesale items with a maximum
23 markup of 10 percent plus a contractor's fee described
24 in Section 2.
25     Q. Got it.

Page 129

1      A. "Cost including markup but not including
2  Contractor's Fee shall not exceed 95 percent of list
3  price or MSRP." So usually when I get an invoice for
4  fixtures, materials, anything, I go look up the MSRP on
5  it. If it's more than -- let's just say I'm paying
6  95 percent of MSRP. That only leaves me room for
7  5 percent markup according to this contract; right?
8      Q. Okay.
9      A. I think that's what it says here, and I
10 believe that's my interpretation of it. And the idea is
11 that, I'll use my lumber company as an example, I get
12 lumber at about 22 percent off. I mark it up
13 10 percent. I still am able to sell it to my customers
14 at about 12 percent off, which is below, say, MSRP.
15 Lumber is a moving target. It's not the same as, say, a
16 television.
17     So in Colton's scenario, I'm assuming that he
18 sent me a -- and this is just speculation, I'm
19 guessing -- he probably sent me a list of fixtures, I
20 probably looked up MSRP on them, and I couldn't mark
21 them up 10 percent, which I would like to do, per my
22 contract without going over the MSRP, which I agreed not
23 to do. So I think what I'm doing is I'm asking Colton
24 to discount his fixtures to keep me within MSRP, or I'm
25 just telling him that if I were to bill it it would put

Page 138

1 discount that he gave Randy.
2   Q. How much should he receive out of that 61,802?
3   A. He'll receive the whole amount.
4   Q. So then your next text is you're saying:
5 "Plus 12500." What does the 12,500 look like?
6   A. I would imagine it's another line item on the
7 bill.
8   Q. Okay.
9   A. Or it might be another bill from another job.
10 It's hard to say. I would have to go look to figure
11 that out.
12   Q. As you go on you say: "Plus 12500 times .10,"
13 which would be 10 percent, "equals 7430." What math
14 computation is going on here?
15   A. I don't know. I looked at that too. I
16 wouldn't be -- I can't remember specifically.
17   Q. Well, but would it be fair that if the 12,500
18 represented some other work Colton was doing on this
19 job, that the math that you compute as $7,430, which
20 would be essentially your builder's fee?
21   A. No, that's not what that is.
22   Q. Help me understand. What does that --
23   A. It wouldn't have anything to do with my
24 builder's fee, I don't think.
25   Q. Now I'm back to being completely confused in

Page 139

1 terms of then why are you telling him in this text this
2 math computation, what are you expressing to him?
3   A. I don't know. Without being able to cross-
4 reference checks and emails and everything else to go
5 with it, it's tough to say because, again, we've done
6 multiple jobs together and that takes invoicing and
7 statements. Obviously we have a pretty elaborate
8 working relationship and agreement so that could be any
9 one of a number of things that we were talking about.
10   Q. When you say: "Must've looked at the package
11 before discount," does that help you at all in terms of
12 explaining this conversation that you were having over
13 text?
14   A. The only thing that that does is it points me
15 in the direction of that we were talking about Randy's
16 contract that Colton discounted.
17   Q. Then he responds back and says: "I am going
18 to bill the remaining 8-ish percent..." Do you have a
19 sense of what he's conveying to you there?
20   A. Let's see the date here. 8/10/17. I'm trying
21 to think of what we were doing. I'm guessing it's a --
22 so when Colton bills me, he bills me in percentages. So
23 let's just say the shades are 100 percent. So when he
24 roughs the -- so design and prewire is, and I might be
25 off on my percentages, but the design and prewire

Page 140

1 represents the first 30 percent. So when he provides a
2 design and prewires the house, he bills that 30 percent.
3 But our agreement is don't bill me for something other
4 than special order equipment until it's complete.
5     So he would, say, maybe start roughing in the
6 wire for the job, and he might bill 10 percent of that
7 30 percent; right? And then some equipment shows up,
8 and in the next 30 days he puts some of the equipment in
9 but he's not quite done so will bill another 12 percent;
10 right? And then at the end of that job when -- at the
11 end of that phase of that first 30 percent of design and
12 rough-in, when he's done, then he -- and that's what I'm
13 always looking for is the percentage of complete. Like,
14 if you're going to bill me 100 percent complete, then
15 you need to be -- of your rough-in phase of your first
16 30 percent, then you need to be done 100 percent of your
17 first 30 percent.
18   Q. So when do you bill the client that 30 percent
19 figure? When he's done with everything?
20   A. I bill the client exactly as he bills me.
21   Q. So I think we're almost done with this. Then
22 a couple lines down he says: "So now I just need to
23 know how you want the additional lighting draw invoice
24 to be." So now what's your interpretation of what he's
25 requesting of you?

Page 141

1   A. He's probably asking me what I'll authorize
2 for billing and completion. Because if he gives me a
3 bill for 70 percent and he's not 70 percent, I'll reject
4 it, and I've done that to him multiple times.
5   Q. Sure. It sounds like you would pace him.
6   A. I do. That's kind of what it is.
7     The other thing that Colton's done is he's
8 changed his bookkeeping process a couple times since
9 I've been working with him. So back to our statement
10 conversation, one of the things I was doing with
11 statements is I was like, Can't you just get your books
12 set up so you can produce a statement and send it to me
13 every month? Because that would be really helpful since
14 him and I have more of a complex business relationship
15 than, say, my plumber or somebody like that because he's
16 providing multiple products for the home, and he's
17 working with us from design on and working with two
18 different companies.
19   Q. Sure.
20   A. So between those companies and his company,
21 the cleaner his accounting process is and the clearer it
22 is, the less likely that we're going to screw anything
23 up. And I have a way to double-check everything. I
24 have division for my multiplication, and I make sure
25 that my business is set up that way. Because it's more

**Page 174**

1  Q. Do you remember being asked about that
2  document?
3  A. Yes.
4  Q. You mentioned something that I'd like to go
5  back and hit on real quickly. That is, you mentioned
6  you obtained it at the owners' request.
7  A. Yes.
8  Q. What was your understanding, if you knew or if
9  you know, what was your understanding of why that was
10  being requested?
11  A. So that the homeowners could have a social
12  gathering at the residence.
13  Q. They did have that gathering?
14  A. They did.
15  Q. One of the other conversations earlier,
16  back-and-forth questions and answers that you had with
17  Counsel, do you remember being asked about specifically
18  Faron? And I believe that's a trucking company or is
19  that the owner, Faron is the owner of a trucking
20  company?
21  A. Correct.
22  Q. Do you remember being asked about how Faron
23  would be differentiated -- referencing Faron, and
24  specifically about Exhibit 6, Section 3, how you
25  distinguish between subcontractors and general labor?

**Page 175**

1  A. I do remember that.
2  Q. One of the examples, another example given was
3  Lucid Construction. When you say "contract labor," are
4  they -- let me ask it a different way.
5     How do you find contract labor, people to fill
6  those positions to help you with the construction?
7  A. How do I find them?
8  Q. Yes. How do you know to go to Lucid
9  Construction or to Faron? And I forgot the name of his
10  trucking company, I know it's in --
11  A. Faron was not contract labor.
12  Q. He was not.
13  A. Faron was a subcontractor.
14  Q. He was a subcontractor.
15  A. He was an excavation subcontractor.
16  Q. So he's a subcontractor. Lucid Construction
17  is contract?
18  A. Correct.
19  Q. How did you find Lucid Construction and how
20  did you bring them on to the job?
21  A. Just by working in my local environment.
22  Q. You've worked with them before?
23  A. Worked around them, yeah. That's how the
24  relationship started.
25  Q. When you bring them on, do they submit bids

**Page 176**

1  for the project or is it just --
2  A. No, they're under my direction on a daily
3  basis, and sometimes even hourly. That's the difference
4  between contract labor and an employee, which work under
5  my direction daily, versus a subcontractor who provides
6  a general scope of work for a certain phase of the
7  project.
8     MR. LEONARD: I think I'm good.
9     MR. ANDERSON: No questions.
10     (Deposition adjourned at 2:03 p.m.)
11     (Signature requested.)
12     (Total time used on the record, 4.5 hours.)

**Page 177**

1        CERTIFICATE OF WITNESS
2     I, JASON GENE WHIPPLE, being first duly sworn,
3  depose and say:
4     That I am the witness named in the foregoing
5  deposition, consisting of pages 1 through 179; that I
6  have read said deposition and know the contents thereof;
7  that the questions contained therein were propounded to
8  me; and that the answers contained therein are true and
9  correct, except for any changes that I may have listed
10  on the Change Sheet attached hereto:
11     DATED this _____ day of _____, 20___.
12
13
14     _____
15     JASON GENE WHIPPLE
16
17     SUBSCRIBED AND SWORN to before me this ____ day
18  of _____, 20___.
19
20     _____
21     NAME OF NOTARY PUBLIC
22     NOTARY PUBLIC FOR _____
23     RESIDING AT _____
24     MY COMMISSION EXPIRES _____
25

# EXHIBIT B



| | |
|---|---|
| Subject | **Re: Project Update** |
| From | Randal Heeb Private <randal.heeb.private@bateswhite.com> |
| To | Jason Whipple <jason@alderwoodbuilders.com> |
| Cc | Ann Merchant <ann.merchant@gmail.com>, Stephen DuMerton <steve@callbrinc.com> |
| Date | 2018-11-18 17:48 |

Thanks Jason. We did use the upstairs fireplace last night for about 3 hours, and there is now so much soot on the glass that all three glass panels are entirely opaque. Can you get one of your guys to come clean the glass and adjust the burner? We are having a caroling party on Friday, and a warm fire is essential to the ambiance. Anytime Mon-Wed would be fine.

Otherwise we have not encountered anything unexpected. The exterior iron work is beautiful, and the steam shower works great!

Have a happy Thanksgiving, and safe travels.

Sent from my phone. 703.785.9012 or 202.747.5968

On Nov 17, 2018, at 8:23 AM, Jason Whipple <jason@alderwoodbuilders.com<mailto:jason@alderwoodbuilders.com>> wrote:

Well I was using voice command on my phone and I think there was a few typos. I meant to say damage not deer.. lol  should always proofread voice command !

On Sat, Nov 17, 2018 at 7:54 AM Jason Whipple <jason@alderwoodbuilders.com<mailto:jason@alderwoodbuilders.com>> wrote:
Oh yea almost forgot to mention snow removal.  I went ahead and installed driveway markers just in case it snows sooner than later.  I recommend having me review the snow removal procedure with  whoever you hired to do the work.  i've seen tons of deer at two properties from snow removal that could easily be avoided with proper planningperiod Anywhere whoever you contract with should come walk the site prior to the first substantial snowfall that I would be happy to meet them once I return.  after several snow removal's and you've established definition you can remove the markers you prefer.  as for now they need to be there to avoid Jeremy adds to the snap edge.

 I also recommend buying a couple of electrical rechargeable snowblowers for the rear deck and lower patio.  this will be convenient when you're using the home and in sure Devic doesn't happen unnecessarily from shovels and equipment. I could follow up more of the subject when I return.

Hope you enjoy your home, I am very excited for you to get to know it and settle in.

Cheers!

Jason


On Fri, Nov 16, 2018 at 11:11 PM Jason Whipple <jason@alderwoodbuilders.com<mailto:jason@alderwoodbuilders.com>> wrote:
Randy, Ann & Stephen,

I received the list from Stephen based on our walk through Wednesday.  I haven't had a chance to review it thoroughly yet but I assume it will be mostly familiar.  I was without Bill this week and the items I had to complete with Colton on the Master mirrors took a little longer than anticipated but after a long week, we got it done.  Didn't leave me much time in the office but I'm taking some time here last minute on Friday to send out a brief update.

There were a few items I didn't complete that were on my list for the week but we got really close.  One of those items is the vault door for the greenhouse under the stairs and the other items were touch up paint and traction tape for the stairs.  It was pretty gloomy and cold on us today and once we pressure washed everything, it just didn't dry out enough for us to get the touch up paint and grip tape complete.  The only other thing that could have been a little more ideal was cleaning on the interior although it's still cleaner than I've ever seen it.  All that said, I feel really good in leaving there this week and am amazed to see the final product rear its head!  It's truly spectacular and amazing in many forms.  It's been a privilege and triumph to say the least.

Again, I haven't had a chance to thoroughly review the list from Stephen.  In the meantime, here a few things I want to put out there prior to your thanksgiving visit and my departure.

So I'm pretty sure everything is functional in the house per our final walkthroughs these last few days.  If something got missed, just put it on the list and we'll be sure to take care of it.  If something urgent comes up, be sure to text me as I may not be responsive to phone calls or emails but will have personnel available if need be.  I don't anticipate any needs but let me know if anything comes up that needs immediate attention during your visit.

Here are a few things to be aware of.

   *   Both of the fireplaces work and have been tested.  However, neither of them have had final calibration.  Based on my experience in testing them, I think the upstairs fireplace may need one jet orphis size smaller for the main burner.  I left the pilot on so feel free to use it as much as you like as using it will let me know if it's burning a little rich.  If it's rich, it will leave some minor soot on the glass and / or the flame may appear to be a little large or yellow.
 Understand it takes a minute to acclimate once you turn them on and you will notice fog on the glass during the acclimation process.  You also might notice a bit of an ignition burst when you first turn it on but not to be concerning.  To turn them on, you need to go to the touch screen, choose the room, select "climate" and you will see the button for turning the fireplace on and off.
 The downstairs fireplace main burner performance is similar but the pilot seams a bit rich.  I did not leave the pilot on for the downstairs fireplace.  I have asked Colton to show you how to turn it on during his visit on Tuesday in case you want to use it as well as demonstrate function.  If you want to use the downstairs fireplace, feel free to but I recommend turning the pilot off after use.  I like to calibrate the fireplaces during the winter for optimum performance.  I also like to have them used prior to calibration to determine the best jetting as the fireplaces take their combustion air from outside and depending on the vent run, each fireplace per home and location while likely require different jets for fine tuning.  Anyway, I don't mean to beat this into the ground but since there was a massive incident involving gas fireplaces next door, I just wanted to reassure you that although your fireplaces may not be perfectly calibrated at this time, they are working properly and safe.  I will have my mechanical contractor calibrate the fireplaces before your next visit so again, please feel free to use them as it will help us with calibration.
   *   We did not mount either of the lights next to the master bed. The sconces have not yet arrived and Colton and Lauren determined it would be best to review the placement of the reading lights prior to installation.  They also include a pin switch so we do have the option of either retro fitting them onto the low voltage switch system to be controlled by a key pad or simply utilizing the pin switch to activate the light, no retrofit required.  My recommendation is to utilize the pin switch.  Colton will review this with you during his visit Tuesday.
   *   I believe the plan is to replace all of the blinds excluding the garage.  In the process, Colton will also correct the mistake of including a privacy shade instead of a blackout shade for the upper shade in the master.  The other debate prior to him confirming the replacement order is to verify whether you want a privacy or a blackout shade for the stairwell.  It's currently privacy but Lauren and Colton had discussion debating whether it should be a black out.  We can't do duel cassette there so we need to make that decision prior to the replacement order.
   *   I'm figuring a full week with two journey man carpenters plus cleaning for shade replacement.  I have full confidence based on my conversations with Colton that this will all be completely covered by the manufacturer.  Since staging will be required to minimize impact, the ultimate scenario would be to install the chandeliers, track light and pool table light in conjunction with replacing the shades.  I'm thinking we could block out two weeks including staging, installation and cleaning and accomplish all items simultaneously.  This is will impact the house the least and make the process most efficient.  All that said, we should have a more in depth conversation regarding coordinating the installation of the above items.
   *   We did have a leak appear on the main service ball valve shut off.  It created a bit of a drywall repair and I had to have the plumber come in to replace it.  My estimate for repair is approximately $1,000 but I have not included it in my bill nor have I received documentation from my plumber for his expenses.  Good news is it's repaired and I will get it covered under warranty.

I leave town in the morning and will not return for business until November 26th.  Again, I will be available via text if you need anything in the meantime.  Upon my return, I will make it a priority to analyze the punch list provided by Stephen and Lauren as well as any additions.  Meanwhile, I hope you enjoy your stay and your new home!

Happy Thanksgiving!

Thanks,

Jason

--

DEF 002146

**EXHIBIT C**



| Subject | RE: Payment for October Expenses [IWOV−IMANAGE.FID741076] |
|---|---|
| From | Tim Tyree <TTyree@hawleytroxell.com> |
| To | <jason@alderwoodbuilders.com> |
| Date | 2018−11−29 15:04 |

- image001.png (~980 B)
- image002.png (~1 KB)
- image003.png (~1 KB)
- image004.jpg (~1 KB)
- image005.png (~18 KB)
- image006.png (~347 B)

Jason,

Randy sent me your e-mail below.

The Construction Agreement says final payment is due when the punchlist is complete but the punchlist is not complete and I understand you have not even started on that work. Admittedly, the punchlist is a work in progress and I understand you and Steve have yet to meet to discuss the punchlist and we need to get the complete list to you, but with items like a leaking shower and the risk of microbial growth, I don't understand the delay on the items listed to date. The outstanding bill is but a miniscule fraction of the total build cost, so I don't see it as unreasonable for Randy and Ann to stick to the contract terms on this point.

As for substantial completion, you stated substantial completion would be November 15, 2018 in your e-mail to Steve on November 12, 2018 ("At this point, the date should be Thursday the 15th from my perspective.") Steve responded on the 15th agreeing to that date. Thus, the terms of Section 12(a) of the Construction Agreement for establishing substantial completion have been met.

Your outstanding invoice was not due until after the date of substantial completion. Thus, we're at final payment.

You make the point that you've extended payment to Colton for materials and I understand Colton is desperate for some amount of payment. Randy and Ann are understanding of his situation, especially as we approach the holidays, and they're willing to make partial payment. Please have Colton reach out to Steve to discuss payment.

I also understand we have an outstanding lighting bill for the chandelier to address. Please get with Steve to coordinate payment by Randy. Randy will pay the supplier directly so there is no out-of-pocket expense to you.

Tᴉᴍ Tʏʀᴇᴇ
*Partner*
direct 208.388.4873
cell 208.345.5885
fax 208.954.5276
email ttyree@hawleytroxell.com
-
877 W. Main St. Suite 1000
Boise, ID 83702

## HAWLEY TROXELL
**Attorneys and Counselors**
Facebook Blue  Twitter Blue  LinkedIn Blue
cid:488AEE3A-B7D1-4559-98D0-90F0EB5AE744
LexMundi_member_logo_b_RGB_PNG
cid:image004.png@01D2D9FD.8C07F250

DEF 002150

# EXHIBIT D

# Invoice



WHIPPLE, INVOICE-35146
265 Potter... McCall ID 83638
Ph: (208) 869-5618... (888) 869-0439
email@alderwoodbuilders.com

| Customer Information: | | Invoice #: | 1468 |
|---|---|---|---|
| Randal Heeb & Ann Merchant | | Date: | 5/2/2015 |
| 1510 Laburnam Street | | Terms: | Due on receipt |
| McLean, VA 22101 | | Project: | |
| | | | 555 Whitewater Dr., Tamarack |

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| Site Preparation Services: | | | |
|   Secesh Engineering - Lidar Survey & Onsite Visit | | 643.40 | 643.40 |
|   Gilbert Mountain Trucking - Equipment & Hauling for Geotechnical Testing & Inspection | | 720.00 | 720.00 |
| Subtotal | | | 1,363.40 |
| 10% Contractor's Fee | 1,363.4 | 0.10 | 136.34 |

| Please remit to above address.  Thank you!!! | Total | $1,499.74 |
|---|---|---|
| | Payments/Credits | -$1,499.74 |
| *Alderwood Builders is a division of Whipple Inc.*<br>*Contractor's License # RCE-35146* | **Balance Due** | **$0.00** |

Notice:  Should the materials or services rendered hereon not be paid for when due, Title 45, Chapter 5, Idaho Code provides a lien
right upon any structure or property for which the materials or services were furnished.

DEF 000488

# Invoice



WHIPPLE, INC. RCE-35146
265 Potters Ln. McCall, ID 83638
Ph: (208) 469-5618 Fx: (888) 869-0439
email@alderwoodbuilders.com

| Customer Information: |
|---|
| Randal Heeb & Ann Merchant |
| 1510 Laburnam Street |
| McLean, VA 22101 |

| Invoice #: | 1474 |
|---|---|
| Date: | 6/10/2015 |
| Terms: | Due on receipt |
| Project: | |
| | 555 Whitewater Dr, Tamarack |

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| Site Prep Services: | | | |
| Robertson Supply Expenses | | | 664.80 |
| Gilbert's Mountain Trucking | | 1,672.00 | 1,672.00 |
| Secesh Engineering | | 120.00 | 120.00 |
| Materials Testing & Inspection | | 1,698.30 | 1,698.30 |
| Labor: Tradesman | 17 | 45.00 | 765.00 |
| Equipment & Hauling | 2 | 75.00 | 150.00 |
| Builder Inventory - Construction Fencing & Posts | | 250.00 | 250.00 |
| Subtotal | | | 5,320.10 |
| Contractor's Fee | 5,320.1 | 0.10 | 532.01 |

| Please remit to above address. Thank you!!! | Total | $5,852.11 |
|---|---|---|
| | Payments/Credits | -$5,852.11 |
| *Alderwood Builders is a division of Whipple Inc.* *Contractor's License # RCE-35146* | Balance Due | $0.00 |

Notice: Should the materials or services rendered hereon not be paid for when due, Title 45, Chapter 5, Idaho Code provides a lien right upon any structure or property for which the materials or services were furnished.

DEF 000492

**Invoice**



WHIPPLE, INC. RCE-35146
265 Pottald ?, McCall ID 83638
Ph: (208) 869-5618 (888) 869-0439
email@alderwoodbuilders.com

| Customer Information: |
|---|
| Randal Heeb & Ann Merchant |
| 1510 Laburnam Street |
| McLean, VA 22101 |

| Invoice #: | 1484 |
|---|---|
| Date: | 8/4/2015 |
| Terms: | Due on receipt |
| Project: | |
| | 555 Whitewater Dr., Tamarack |

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| Site Preparation & Services: | | | |
|    Materials Testing & Inspection | | 536.30 | 536.30 |
|    Materials Testing & Inspection | | 709.60 | 709.60 |
|    Secesh Engineering | | 691.20 | 691.20 |
|    Gilbert's Mountain Trucking | | 14,926.00 | 14,926.00 |
| Subtotal | | | 16,863.10 |
| Contractor's Fee | 16,863.1 | 0.10 | 1,686.31 |

| Please remit to above address.  Thank you!!! | | Total | $18,549.41 |
|---|---|---|---|
| *Alderwood Builders is a division of Whipple Inc.* | | Payments/Credits | -$18,549.41 |
| *Contractor's License # RCE-35146* | | Balance Due | $0.00 |

Notice:  Should the materials or services rendered hereon not be paid for when due, Title 45, Chapter 5, Idaho Code provides a lien right upon any structure or property for which the materials or services were furnished.

DEF 000500

# Invoice



WHIPPLE, INVOICE-35146
265 Potter Drive, McCall, ID 83638
Ph: (208) 869-5618  (888) 869-0439
email@alderwoodbuilders.com

| Customer Information: |
|---|
| Randal Heeb & Ann Merchant |
| 1510 Laburnum Street |
| McLean, VA 22101 |

| Invoice #: | 1491 |
|---|---|
| Date: | 9/5/2015 |
| Terms: | Due on receipt |
| Project: | |
| | 555 Whitewater Dr, Tamarack |

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| Site Preparation Services: | | | |
|    Materials Testing & Inspection | | 1,155.00 | 1,155.00 |
|    Gilbert's Mountain Trucking | | 40,218.00 | 40,218.00 |
|    Robertson Supply | | | 1,690.70 |
|    Construction Services (Journeyman w/ Tools) | 5 | 45.00 | 225.00 |
|    Hauling & Delivery | 6 | 75.00 | 450.00 |
|    Tamarack Design Review Fee (due at preliminary design submittal) | | 4,000.00 | 4,000.00 |
|    Valley County Building Permit & Plan Review Fee (Estimated) | | 10,567.00 | 10,567.00 |
| Subtotal | | | 58,305.70 |
| Contractor's Fee | 58,305.7 | 0.10 | 5,830.57 |

| Please remit to above address.  Thank you!!! | Total | $64,136.27 |
|---|---|---|
| *Alderwood Builders is a division of Whipple Inc.* | Payments/Credits | -$64,136.27 |
| *Contractor's License # RCE-35146* | Balance Due | $0.00 |

Notice: Should the materials or services rendered hereon not be paid for when due, Title 45, Chapter 5, Idaho Code provides a lien right upon any structure or property for which the materials or services were furnished.

DEF 000506

# Invoice



WHIPPLE, INVOICE-35146
265 Potter Lane, McCall, ID  83638
Ph: (208) 469-5618 — (888) 869-0439
email@alderwoodbuilders.com

| Customer Information: |
|---|
| Randal Heeb & Ann Merchant |
| 1510 Laburnam Street |
| McLean, VA 22101 |

| Invoice #: | 1498 |
|---|---|
| **Date:** | 10/2/2015 |
| **Terms:** | Due on receipt |
| **Project:** | |
| | 555 Whitewater Dr., Tamarack |

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| Site / Foundation Services: | | | |
|   Gilbert's Mountain Trucking (excavation, backfill, grade & retainage) | | 51,430.00 | 51,430.00 |
|   Performance Engineers (structural engineering) | | 6,150.40 | 6,150.40 |
|   Solid Earth (micro-piles & installation) | | 65,879.00 | 65,879.00 |
| Subtotal | | | 123,459.40 |
| Contractor's Fee | 123,459.4 | 0.075 | 9,259.46 |

| | |
|---|---|
| **Total** | **$132,718.86** |
| **Payments/Credits** | -$132718.86 |
| **Balance Due** | **$0.00** |

*Alderwood Builders is a division of Whipple Inc.*
*Contractor's License # RCE-35146*

Notice:  Should the materials or services rendered hereon not be paid for when due, Title 45, Chapter 5, Idaho Code provides a lien
right upon any structure or property for which the materials or services were furnished.

DEF 000515

**Invoice**



WHIPPLE, INVOICE-35146
265 Potter Lane, McCall, ID 83638
Ph: (208) 869-5610  Fax (888) 869-0439
email@alderwoodbuilders.com

| Customer Information: |
| --- |
| Randal Heeb & Ann Merchant |
| 1510 Laburnam Street |
| McLean, VA 22101 |

| Invoice #: | 1504 |
| --- | --- |
| Date: | 11/5/2015 |
| Terms: | Due on receipt |
| Project: | |
| | 555 Whitewater Dr, Tamarack |

| Description | Quantity | Rate | Amount |
| --- | --- | --- | --- |
| Site & Foundation Services: | | | |
| Materials Testing & Inspection | | 360.00 | 360.00 |
| Clearwater Concrete | | 10,894.88 | 10,894.88 |
| Coburn Concrete Construction Co. | | 15,900.00 | 15,900.00 |
| Concrete Construction Supply | | 6,738.64 | 6,738.64 |
| Gilbert's Trucking | | 12,160.00 | 12,160.00 |
| Morell's Concrete Pumping | | 1,676.95 | 1,676.95 |
| Northlake Sewer District (permit) | | 70.00 | 70.00 |
| Peloton Plumbing | | 473.00 | 473.00 |
| Robertson Supply | | 1,123.221 | 1,123.22 |
| | | | |
| Subtotal | | | 49,396.69 |
| Contractor's Fee | 49,396.69 | 0.075 | 3,704.75 |

| | | | |
| --- | --- | --- | --- |
| | **Total** | | **$53,101.44** |
| *Alderwood Builders is a division of Whipple Inc.* | **Payments/Credits** | | **-$53,101.44** |
| *Contractor's License # RCE-35146* | **Balance Due** | | **$0.00** |

Notice:  Should the materials or services rendered hereon not be paid for when due, Title 45, Chapter 5, Idaho Code provides a lien
right upon any structure or property for which the materials or services were furnished.

DEF 000523

# Invoice



WHIPPLE, INC.  RCE-35146
265 Potter Lane, McCall, ID 83638
Ph: (208) 869-5618  (888) 869-0439
email@alderwoodbuilders.com

| Customer Information: |
|---|
| Randal Heeb & Ann Merchant |
| 1510 Laburnam Street |
| McLean, VA 22101 |

| Invoice #: | 1510 |
|---|---|
| Date: | 12/9/2015 |
| Terms: | Due on receipt |
| Project: | |
| | 555 Whitewater Dr., Tamarack |

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| Site & Foundation Services: | | | |
| Clearwater Concrete, Inc. | | 4,988.08 | 4,988.08 |
| Coburn Construction | | 6,800.00 | 6,800.00 |
| Concrete Construction Supply | | 211.05 | 211.05 |
| Honey Dippers - Oct. & Nov. | | 330.00 | 330.00 |
| McCall Construction Services (3 hrs @ $45 / hr) | 3 | 45.00 | 135.00 |
| Morell's Concrete Pumping | | 971.58 | 971.58 |
| Robertson Supply (return) | | -48.52 | -48.52 |
| Summit Contracting Services - crane | | 825.00 | 825.00 |
| Subtotal | | | 14,212.19 |
| Contractor's Fee | 14,212.19 | 0.075 | 1,065.91 |

| Please remit to above address.  Thank you!!! | Total | $15,278.10 |
|---|---|---|
| | Payments/Credits | -$15,278.10 |
| *Alderwood Builders is a division of Whipple Inc.* | Balance Due | $0.00 |
| *Contractor's License # RCE-35146* | | |

Notice:  Should the materials or services rendered hereon not be paid for when due, Title 45, Chapter 5, Idaho Code provides a lien right upon any structure or property for which the materials or services were furnished.

DEF 000544

# EXHIBIT E

# Invoice



WHIPPLE, INC. RCE-35146
265 Powderhouse RCC CLID 83638
Ph: (208) 869-5615 (888) 869-0439
email: alderwoodbuilders.com

| Customer Information: |
|---|
| Randal Heeb & Ann Merchant |
| 1510 Laburnam Street |
| McLean, VA 22101 |

| Invoice #: | 1574 |
|---|---|
| Date: | 4/6/2017 |
| Terms: | Due on receipt |
| Project: | |
| 555 Whitewater, Tamarack | |

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| EarthLink Geothermal - Deposit | | 3,000.00 | 3,000.00 |
| Jim Lester's Plumbing & Heating | | 3,585.00 | 3,585.00 |
| Robertsons Supply | | | 3,385.46 |
| Subtotal | | | 9,970.46 |
| | | | |
| Item 25:  Central Dimming Lighting | | | |
| Audio Video Plus - half of design / cabling and headend equipment deposit. (35%) | | 27,322.93 | 27,322.93 |
| Subtotal | | | 27,322.93 |
| | | | |
| Item 30:  Plumbing Fixtures | | | |
| Robertson Supply | | 517.00 | 517.00 |
| Subtotal | | | 517.00 |
| | | | |
| Item 35:  Bathroom Walls, Tubs & Showers | | | |
| Pro-Build | | 928.14 | 928.14 |
| Daltile | | 685.29 | 685.29 |
| Hot Shots, Inc. | | 27.95 | 27.95 |
| Cornick Mountain Masonry | | 3,825.85 | 3,825.85 |
| Subtotal | | | 5,467.23 |
| | | | |
| Item 39:  Snow Removal | | | |
| Pro-Build (ice melt) | | 38.00 | 38.00 |
| Labor | 45 | 10.00 | 450.00 |
| Laborer w/ Snow Blower | 75 | 26.00 | 1,950.00 |
| Subtotal | | | 2,438.00 |
| | | | |
| Invoice Subtotal | | | 102,289.34 |
| Contractor's Fee | | 0.05 102289.34 | 5,114.47 |

| | |
|---|---|
| **Total** | **$107,403.81** |
| **Payments/Credits** | -$107403.81 |
| **Balance Due** | **$0.00** |

*Alderwood Builders is a division of Whipple Inc.*
*Contractor's License # RCE-35146*

Notice:  Should the materials or services rendered hereon not be paid for when due, Title 45, Chapter 5, Idaho Code provides a lien
right upon any structure or property for which the materials or services were furnished.

DEF 000905

**EXHIBIT F**



# RANDAL HEEB, PHD

Partner
Washington, DC

📞 202.747.5968
✉ randal.heeb@bateswhite.com   📇 vCard

SUMMARY     SELECTED WORK     NEWS & INSIGHTS

Randal Heeb has 30 years of experience providing economic analysis in both the private and public sectors. His expertise includes analysis of liability, damages, and other remedies in antitrust and intellectual property disputes. Dr. Heeb has written, consulted, and testified on a range of issues related to the application of economic and econometric analyses in a variety of industries, including software, computer hardware, telecommunications, commodities and financial markets, pharmaceuticals, electricity, natural gas, and gaming.

Dr. Heeb is recognized as a leading competition economist by Global Competition Review in Who's Who Legal - Competition. He has previously held various academic posts in the United States and Europe and was most recently a Senior Faculty Fellow at the Yale School of Management. Dr. Heeb has served private sector clients and public authorities operating in both regulated and unregulated markets, and he has taught antitrust compliance to executives in North America, Europe, and Asia.

## EDUCATION

PhD, Economics, University of Chicago

MPA, John F. Kennedy School of Government, Harvard University

BA, Economics, University of Washington

## PRACTICES



## Intellectual Property

### Judge agrees with Bates White Partner Randal Heeb's conclusions in ruling that poker is a game of skill, not chance

Working on behalf of the defendant in the matter *USA v. Lawrence Dicristina*, Bates White Partner Randal Heeb testified in federal district court that poker is predominantly a game of skill, rather than one of chance. The case involved a Staten Island man running a poker game out of his shop, reigniting the question of whether poker is considered to be a form of gambling and therefore illegal under the Illegal Gambling Business Act (IGBA). Judge Jack B. Weinstein ultimately ruled that poker is "predominated by skill" and therefore does not fit the definition of gambling under the IGBA. Judge Weinstein cited Dr. Heeb's testimony extensively in his decision, noting that "[Dr. Heeb's] studies and conclusions are found to be accurate and persuasive by this court, which heard and analyzed all the evidence."

Dr. Heeb, an expert in game theory and econometrics, and an avid poker player who has won an event at the World Series of Poker, based his conclusions on several opinions and analyses. Dr. Heeb described to the court the vast number of complicated decisions involved in poker, and how these complex strategic considerations allow players of varying skill to differentiate themselves. He also described how many players make a living playing poker and win consistently over time. Dr. Heeb testified that both of these factors distinguish poker from games predominated by chance, such as roulette.

The core of Dr. Heeb's testimony involved several analyses that he and the Bates White team conducted. These analyses were based upon a remarkable data set of over 415 million hands of No Limit Hold'em poker played online, which included all of the players' hidden hole cards, betting decisions, and results. Based on analysis of these hundreds of millions of hands, Dr. Heeb demonstrated that a player's level of success on one set of hands is predictive of the player's success on other hands. Essentially, successful players consistently win more than less successful players with virtually all starting hands they are dealt—a result that is to be expected in a game predominated by skill but not in a game predominated by chance. Another key analysis involved implementing an econometric model to estimate the skill level of players based upon a large number of variables regarding the strategies and tactics they employ. Dr. Heeb found that players predicted to be of high skill reliably outperform players predicted to be of lesser skill, and that high-skilled players will predominate over less-skilled players in a relatively short amount of time. Based on this analysis, Dr. Heeb was able to quantify the relative contributions of skill and chance in No Limit Hold'em and show conclusively that skill predominates over chance.

In this decision, Judge Weinstein wrote that Dr. Heeb "has shown persuasively that skilled players will predominate over the less skilled in a relatively short time," supporting his ultimate findings about the question of skill versus chance.